The **FRANKLIN LIFE INSURANCE COMPANY**, an Illinois corporation, Plaintiff-Appellant,

v.

**WILLIAM J. CHAMPION AND COMPANY,** a Michigan corporation, Defendant-Appellee.

No. 15753.

United States Court of Appeals
Sixth Circuit.

Aug. 27, 1965.

David G. Barnett and Thomas F. Shea, Detroit, Mich., for appellant, Fischer, Sprague, Franklin & Ford, Leon R. Jones, Detroit, Mich., on the brief.

Richard F. Newton, Detroit, Mich., for appellee, Cross, Wrock, Miller, Vieson & Kelley, Glen R. Miller, David H. Patton, Detroit, Mich., on the brief.

Before MILLER and PHILLIPS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

The issue in this case, involving life insurance, may be stated as follows: Whether, when an insured is asked if he is in good health at the time of reinstatement of a policy and he answers that he is, the policy, then reinstated, can be rescinded by the insurance company when it appears that the insured was, at the time of his answer, suffering from a serious disease from which he thereafter died, but did not know, at the time, that he was suffering from such disease and did not have reason to suspect it. Upon suit on the policy, the district court found that at the time the application for reinstatement was submitted, the insured did not believe, nor did he have any reason to believe, that he was suffering from a serious disease; that the insurance company could not subsequently rescind the contract of insurance; and, accordingly, the district court entered a judgment against the insurance company for the full amount of the insurance then due. From this judgment, the insurance company appeals.

The background of this case is as follows: William J. Champion and Company, Realtors, on June 18, 1959, took out a life insurance policy on the life of William J. Champion, Jr., of Grosse Pointe Farms, Michigan, its President. The policy was in the face amount of $100,000, and was issued by The Franklin Life Insurance Company. Quarterly payments of premiums were then made until June 18, 1960, when a default occurred. The defaulted payment was not made within the grace period of one month thereafter. Subsequently, defendant tendered payment of the defaulted premium by check, which was received by the insurance company on July 30, 1960. In response to the tender, defendant was advised that the insurance had lapsed and that reinstatement would be considered upon submission of a completed application therefor. The check which had been tendered for reinstatement was retained by the insurance company. On August 4, 1960, the insurance company furnished William J. Champion and Company, the defendant-appellee, a form for application for reinstatement, and on August 10, 1960, it received from defendant-appellee, the application for reinstatement of insurance on the life of Mr. Champion, which contained the following statements in answer to certain of the company's questions:

"5. What physicians or practitioners have you consulted or been

118

treated by during the past? (Give all dates and details.)

Answer—DR. NELSON TAYLOR —Routine Check-up 1960;

DR. AL LARGE—For Heel Injury No. 1957."

"7. Are you now in good health? (If not, give details.)

Answer—YES."

The application was signed by William J. Champion, Jr., and by Catherine Wood Champion, his wife, who was Vice-President of defendant company and who signed on its behalf.

Upon receiving the application for reinstatement, appellant company sent its Family Physician's Blank to Dr. Nelson Taylor, requesting that it be completed and returned. Dr. Taylor stated that he did not give Mr. Champion a complete examination on July 1, 1960, but, in reply to the insurance company's request, he filled out the form under date of August 25, 1960, and returned it to defendant. Dr. Taylor stated in the form that he had found "No organic pathology" and that an analysis of the urine, a complete blood count, a chest X-ray, and a Kahn test had negative results. Under the heading "Predominant symptoms and physical findings, including blood pressure," Dr. Taylor wrote: "Request for complete examination." Thus, the physician's statement contained no information inconsistent with the statements of the insured in the application for reinstatement.

On August 29, 1960, plaintiff insurance company received this completed medical form from Dr. Taylor. Relying upon the information contained in the application form and in the medical form, Doris Smith and Willard O'Connor, underwriters in the employ of plaintiff, approved the application for reinstatement; the policy was reinstated as of August 30, 1960; and the check which had been received on July 30, 1960, was deposited by the insurance company. For some months prior to the time the application for reinstatement was submitted, Mr. Champion had experienced recurrent headaches and some visual difficulties.

He attributed the headaches to an allergy, and his opinion was confirmed by medical advice that he received. The visual difficulties he attributed to bifocal glasses he first wore in May 1960.

On the afternoon of August 31, 1960, the day after the policy had been reinstated, Mr. Champion experienced a particularly severe and disabling headache. On September 1, 1960, he consulted Dr. Taylor and had a complete physical examination; and on September 2, 1960, he was admitted to St. John Hospital, Detroit, Michigan, for tests. The evidence shows that an appointment for a complete physical had, strangely enough, been made two months in advance. In the meantime, Dr. Taylor had gone to Europe. In any event, after the examination by Dr. Taylor on September 1, 1960, and the admission of Mr. Champion to St. John Hospital for tests on September 2, 1960, those tests indicated the existence of a lesion of the brain. Mr. Champion was transferred to Grace Hospital on September 4, 1960, and remained in that hospital until September 21, 1960; was readmitted as a patient to Grace Hospital on November 14, 1960, where he remained until January 6, 1961. Dr. Gurdjian was the attending physician. Mr. Champion was then readmitted to Grace Hospital on January 16, 1961, and remained there until January 20, 1961; was readmitted to Grace Hospital on February 21, 1961, where he remained until his death on March 30, 1961. Death was due to a malignant meningioma, whose growth had not been arrested by surgery, or by subsequent cobalt treatment.

The answer to the fifth question of the application for reinstatement, above quoted, inquiring as to what physicians had been consulted by Mr. Champion, was incomplete in that it omitted the name of Dr. James E. Coyle, whom Mr. Champion had consulted on August 4, 1960, with reference to headaches. Dr. Coyle, a specialist in diseases of the ear, nose, and throat, gave Mr. Champion a complete ear, nose, and throat examination. His diagnosis was allergic rhinitis, an inflammation of the nose, with nasal and

sinus congestion, caused by an allergy, for which the physician prescribed medicine to open the nasal passages and to relieve pain. The answer to the fifth question of the application for reinstatement was incomplete with regard to another item, in that it failed to disclose that Mr. Champion had also consulted Dr. Taylor on July 1, 1960, with reference to headaches, although he did disclose that in 1960 he had consulted Dr. Taylor, and at that time had what Mr. Champion referred to as a "routine checkup," but which Dr. Taylor refers to as an office visit for some complaint but not a complete physical examination. We are not informed as to what the "routine checkup" was for.

Mr. Champion was suffering from a malignant meningioma at the time the application for reinstatement was submitted. The existence of the disease was discovered only upon his admission to the hospital. Proof of Mr. Champion's death was submitted to plaintiff by defendant in accordance with the terms of the policy.

On March 15, 1961, two weeks prior to Mr. Champion's death, plaintiff gave notice of the rescission of the policy and rescission of reinstatement by letter delivered to William J. Champion and Company; and the insurance company tendered refund of premium payments made subsequent to the reinstatement with interest to the date of tender.

In his findings of fact, the district judge found that at the time the application for reinstatement of the life insurance policy was submitted to the insurance company, Mr. Champion made the application in good faith, and did not believe, nor did he have any reason to believe, that his headaches and visual defects were symptoms of a serious disease; that Mr. Champion continued to be active in the conduct of his business; that he personally cared for the rather extensive grounds and gardens about his house; that he personally painted a considerable portion of his large house in the summer of 1960; that on August 27, 1960, Mr. Champion, with his wife, attended the wedding and subsequent reception of his secretary's daughter. He drove to the wedding, danced, and he and his wife were among the last to leave, departing about 1:30 A.M. of August 28, 1960; and he led an active business and social life, and participated with his family in a vigorous swim meet at the Grosse Pointe Hunt Club on August 28, 1960, which he won for his team by making a very fast swim. On this day he posed for a photograph with his wife and eight children at the side of a pool. In this photograph, he is erect, smiling, and the the picture and personification of vigor and good health. This was the day before the insurance company received the completed medical form from Dr. Taylor, and two days before the reinstatement of the policy.

With regard to the phrase "routine checkup," used by Mr. Champion in his answer to question 5 on the application for reinstatement of insurance, the trial court found that while the phrase might not have an accepted meaning, it suggested a consultation in which the patient had no complaint; and that the form which was completed by Dr. Taylor also failed to disclose the fact that Mr. Champion had complained of headaches. Dr. Taylor, on August 25, 1960, completed the form which he had received from the insurance company for reinstatement, noting that no predominant symptoms were observed. The insurance company received this completed form from Dr. Taylor on August 29, 1960, and reinstated the policy as of August 30, 1960. The district judge, in his findings, remarked that while plaintiff insurance company contended that the failure to disclose the headaches constituted an intentional withholding of material facts, "it was equally possible" that the headaches were not believed to be serious on July 1, 1960, and, since no organic basis for the complaint could be found, they were not regarded as symptoms of a serious character. Moreover, it appeared that Mr. Champion had arranged the appointment for a complete physical examination for September 1, 1960, and

had made this appointment two months in advance; that it was not credible that such a complete physical examination would have been put off for two months if the headaches which Mr. Champion experienced were severe and disabling; and that it was not credible that, if Mr. Champion had told his physician that they were severe and disabling, Dr. Taylor would have omitted to mention them when he completed the form for the insurance company. In conclusion, the trial court found that Mr. Champion's answer that, at the time he made the application for reinstatement, he was in good health, was made in good faith, and that he did not have any reason to believe he was not generally in good health until the afternoon of August 31, 1960; and that plaintiff insurance company knew that, in replying to this question in the application for reinstatement, Mr. Champion could answer only to the best of his knowledge, and the insurance company could not and did not expect him to inform it of impairments of his health of which he was not aware.

The principal issue in the case is whether Mr. Champion's answer in his application for reinstatement, that he was in good health, rendered the reinstatement of the policy void. We assume that the answer was made in good faith, as the district court so found, and there was evidence to sustain the finding. There seems to be no question that at the time he was suffering from carcinoma of the brain; and the evidence supports the finding of the district court that he was completely ignorant of having the disease, and had no reasonable ground to suspect that he was not in good health.

Appellee contends that in reply to the insurance company's question in its application form of reinstatement, "Are you now in good health?", Mr. Champion's answer, "Yes," was a statement made in good faith with no reasonable cause on his part to believe that he was not in good health; that such answer was properly held by the district court to be only a representation that in good faith, he believed he was in good health; that

such answer made in good faith, even if untrue in the narrow sense, but true in the broader sense of being honest, sincere, and not fraudulent, was not such a false statement as would avoid reinstatement of the policy.

Appellant contends that such an untrue statement is ground for rescission of the insurance contract, if it materially affected assumption of the risk by the insurer.

The general rule and weight of authority hold that the statement of an applicant for insurance that he was in good health is a representation only that he believed he was in good health. In Bronx Savings Bank v. Weigandt, 1 N.Y.2d 545, 154 N.Y.S.2d 878, 136 N.E.2d 848, 60 A.L.R.2d 1422, the Court of Appeals of New York said:

"A representation as to good health in an application for insurance * * is not an affirmation of fact and does not provide a basis for rescission in the absence of proof of actual fraud."

Speaking of such representations in Sommer v. Guardian Life Ins. Co. of America, 281 N.Y. 508, 24 N.E.2d 308, the Court of Appeals said:

"The applicant does not guarantee the literal truth of the statement, nor do the parties condition their contract upon the existence of good health. The representation is not part of the contract; it is a 'statement inducing the formation of the contract as distinguished from an affirmation of fact or a promise incorporated in and material to the contract.' 3 Williston on Contracts [Rev. ed.], § 673; Vance on Insurance, pp. 389, 390; 4 Couch, Cyclopedia of Insurance Law, §§ 824, 885. Such statements must be construed in the light of their purpose to furnish to the company information which will enable it to decide whether it shall make a contract of insurance in which the information furnished will not be incorporated as an affirmation of fact.

*"The courts, both State and Federal, have generally construed statements that an applicant was in good health or free from disease as a representation only that the applicant in good faith believed and was justified in believing that his health was not impaired by any condition which would ordinarily be regarded as a 'disease.'* The representation cannot reasonably be understood as intended to do more than convey to the company such information as the applicant might be expected to have and to give to the company assurance that the applicant has had no symptom of disease which would, ordinarily, act as a warning or notice, even to a layman, that his health might be impaired in substantial degree, and assurance that the applicant, in good faith, believes that he is in fact a well person." (Emphasis supplied.)

In Moulor v. American Life Ins. Co., 111 U.S. 335, 4 S.Ct. 466, 28 L.Ed. 447, the leading case, and the most persuasive, on the subject, the court held that when a policy of insurance had been so framed as to leave room for construction, rendering it doubtful whether the parties intended the exact truth of the applicant's statements to be a condition precedent to any binding contract, the court should lean against that construction which imposes upon the assured the obligations of a warranty. The court said:

"Assuming—as in view of the finding of the jury we must assume —that the insured was, at the date of his application, or had been prior thereto, afflicted with the disease of scrofula, asthma, or consumption, the question arises whether the beneficiary may not recover, unless it appears that he had knowledge, or some reason to believe when he applied for insurance, that he was or had been afflicted with either of those diseases. The Circuit Court plainly proceeded upon the ground that his knowledge or belief as to having been afflicted with the dis-

eases specified, or some one of them, was not an essential element in the contract; in other words, if the assured ever had, in fact, any one of the diseases mentioned in his answer to the seventh question, there could be no recovery, although the jury should find from the evidence that he acted in perfect good faith, and had no reason to suspect, much less to believe or know, that he had ever been so afflicted."

The court went on to state the manner in which an insurance company could stipulate in the contract of insurance how a statement of the insured as to good health might be construed as a warranty and binding upon him regardless of its being "untrue" in the narrow sense. The court said:

"If, upon a reasonable interpretation, such was the contract, the duty of the court is to enforce it according to its terms; for the law does not forbid parties to a contract for life insurance to stipulate that its validity shall depend upon conditions or contingencies such as the court below decided were embodied in the policy in suit. The contracts involved in Jeffries v. [Economical] Life Ins. Co. 22 Wall. 47 [22 L.Ed. 833], and Aetna Life Ins. Co. v. France, etc., 91 U.S. 510 [23 L.Ed. 401], were held to be of that kind. *But, unless clearly demanded by the established rules governing the construction of written agreements, such an interpretation ought to be avoided. In the absence of explicit, unequivocal stipulations requiring such an interpretation, it should not be inferred that a person took a life policy with the distinct understanding that it should be void, and all premiums paid thereon forfeited, if at any time in the past, however remote, he was, whether conscious of the fact or not, afflicted with some one of the diseases mentioned in the question to which he was required to make a categorical answer.* If those who organize and control life insur-

ance companies wish to exact from the applicant, as a condition precedent to a valid contract, a guaranty against the existence of diseases, of the presence of which in his system he has and can have no knowledge, and which even skillful physicians are often unable, after the most careful examination, to detect, the terms of the contract to that effect must be so clear as to exclude any other conclusion.

"In Nat. Bank v. Ins. Co., 95 U.S. 673, [24 L.Ed. 563],—which was a case of fire insurance, involving, among others, the question whether the statements as to the value of the property insured were warranties—it was said: 'When a policy of insurance contains contradictory provisions, or has been so framed as to leave room for construction, rendering it doubtful whether the parties intended the exact truth of the applicant's statements to be a condition precedent to any binding contract, the court should lean against that construction which imposes upon the assured the obligation of a warranty. The company cannot justly complain of such a rule. Its attorneys, officers, or agents prepared the policy for the purpose, we shall assume, both of protecting the company against fraud, and of securing the just rights of the assured under a valid contract of insurance. It is its language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself.' See, also Grace v. American [Cent.] Ins. Co., 109 U.S. 278, 282 [3 S.Ct. 207, 27 L.Ed. 932]. These rules of interpretation, equally applicable in cases of life insurance, forbid the conclusion that the answers to the questions in the application constituted warranties, to be literally and exactly fulfilled, as distinguished from representations which must be substantially per-formed in all matters material to the risk; that is, in matters which are of the essence of the contract." (Emphasis supplied.)

As to the good faith of the answers of the insured with regard to his health, the court said:

"But it is contended that if the answers of the assured are to be deemed representations only, the policy was, nevertheless, forfeited, if those representations were untrue in respect of any matters material to the risk. The argument is that if the insured was, at the time of his application, or had been at any former period of his life, seriously or in an appreciable sense, afflicted with scrofula, asthma, or consumption, his answer, without qualification, that he had never been so afflicted, being untrue, avoided the policy, without reference to any knowledge or belief he had upon the subject. The soundness of this proposition could not be disputed if, as assumed, the knowledge or good faith of the insured, as to the existence of such diseases, was, under the terms of the contract in suit, of no consequence whatever in determining the liability of the company. But is that assumption authorized by a proper interpretation of the two instruments constituting the contract? We think not." (Moulor v. American Life Ins. Co., 111 U.S. 335, pp. 340, 341, 342 and 343, 4 S.Ct. p. 470).

On the question of the answers of an applicant for life insurance to questions propounded by the insurance company and their effect upon the validity of the policy, the court, in the Moulor case, supra, went on to hold that when an applicant for life insurance was required to state categorically whether he had been afflicted with certain diseases and answered that he had not, it was reasonably clear from the clauses of the policy that the company required as a condition precedent to a valid contract nothing more than that the insured would observe good faith toward it, and make full, direct, and

honest answers to all questions, without evasion or fraud, and without misrepresentation or concealment of facts, with which the court ought to be made acquainted; that, in the absence of explicit stipulations requiring such an interpretation, it should not be inferred that the insured took a life policy with the understanding that it should be void, if he was, whether conscious of the fact or not, afflicted with any of the diseases specified in the questions propounded by the company. The court declared that such a construction of the contract should be avoided unless clearly demanded by the rules governing the interpretation of written instruments. In passing upon the foregoing propositions, and stating the governing law, the court said:

"Looking into the application upon the faith of which the policy was issued and accepted, we find much justifying the conclusion that the company did not require the insured to do more, when applying for insurance, than observe the utmost good faith, and deal fairly and honestly with it, in respect of all material facts about which inquiry is made, and as to which he has or should be presumed to have knowledge or information. The applicant was required to answer yes or no as to whether he had been afflicted with certain diseases. In respect of some of those diseases, particularly consumption, and diseases of the lungs, heart, and other internal organs, common experience informs us that an individual may have them in active form, without at the time, being conscious of the fact, and beyond the power of any one, however learned or skillful, to discover. Did the company expect, when requiring categorical answers as to the existence of diseases of that character, that the applicant should answer with absolute certainty about matters of which certainty could not possibly be predicated? Did it intend to put upon him the responsibility of knowing that which, perhaps, no one, however thoroughly trained in the study of human diseases, could possibly ascertain?"

As to what is meant by true and untrue answers, the court said:

"The entire argument in behalf of the company proceeds upon a too-literal interpretation of those clauses in the policy and application which declare the contract null and void if the answers of the insured to the questions propounded to him were, in any respect, untrue. What was meant by 'true' and 'untrue' answers? In one sense, that only is true which is conformable to the actual state of things. In that sense, a statement is untrue which does not express things exactly as they are. But in another and broader sense the word 'true' is often used as a synonym of honest, sincere, not fraudulent. Looking at all the clauses of the application, in connection with the policy, it is reasonably clear—certainly the contrary cannot be confidently asserted—that what the company required of the applicant, as a condition precedent to any binding contract, was, that he would observe the utmost good faith towards it, and make full, direct, and honest answers to all questions, without evasion or fraud, and without suppression, misrepresentation, or concealment of facts with which the company ought to be made acquainted; and that by so doing, and only by so doing, would he be deemed to have made 'fair and true answers.'

" * * * It was an erroneous construction of the contract to hold, as the court below did, that the company was relieved from liability if it appeared that the insured was, in fact, afflicted with the diseases, or any of them, mentioned in the charge of the court. The jury should have been instructed, so far as the matters here under examination are concerned, that the plaintiff was not precluded from recovering on the policy, unless it appeared from all the cir-

cumstances, including the nature of the diseases with which the insured was alleged to have been afflicted, that he knew, or had reason to believe, at the time of his application, that he was or had been so afflicted." pp. 343, 344, 345, 346, 4 S.Ct. pp. 471, 472.

In Standard Life and Accident Ins. Co. v. Sale, 121 F. 664 (C.A. 6), this court considered the Moulor case in the course of its opinion, holding that a life insurance company may require the insured to warrant that he has never had any bodily or mental infirmity except as stated in the contract of insurance, and that he is in sound condition mentally and physically, except as therein stated. The cited case was decided on the *warranties* made by the insured. The life insurance policy there provided that "insured * * makes the following true and complete statements, which are hereby made a part of the contract of insurance, and if any of said statements shall be untrue in any respect, then this policy shall be null and void. * * * I have never had * * * any bodily or mental infirmity. * *, except as herein stated, * * * I am in sound condition mentally and physically, except as herein stated." These statements were held to be *warranties* by the insured, and *not mere representations resting on the belief of the insured.* In distinguishing this case from Moulor v. American Life Ins. Co., 111 U.S. 335, 4 S.Ct. 466 the court said that with respect to the pertinent part of the opinion in the Moulor case, the Supreme Court was employed "in demonstrating that the statements of the insured were not intended as a warranty of the facts, but as a warranty of the good faith of the insured in making them. The whole inquiry was determined when that result was reached. But here that question was settled by the terms of the policy, and there is no room left for the court to find, in doubtful phraseology, a meaning which may be cut down to a representation made of the honest belief of the insured. That has been done which Mr. Justice Harlan said insurers would have to do

in order to lay such hard lines for the insured. 'If,' said he, 'those who organize and control life insurance companies wish to exact from the applicant, as a condition precedent to a valid contract, a guaranty against the existence of diseases, of the presence of which in his system he has and can have no knowledge, and which even skillful physicians are often unable, after the most careful examination, to detect, the terms of the contract to that effect must be so clear as to exclude any other conclusion.'" Standard Life & Accident Ins. Co. v. Sale, supra, p. 668.

In the instant case, contrary to Standard Life and Accident Ins. Co. v. Sale, supra, there is no question of a warranty before us. The original policy itself provides:

"All statements made by the Insured or on his behalf shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall be used in defense to a claim under this Policy unless it is contained in the application and a copy of the application is attached to this Policy when issued."

There is nothing in this case which requires that answers in the application for reinstatement are to be deemed warranties. In fact, there is no claim of warranty. Consequently, under the Supreme Court decision in the Moulor case, supra, the statement of Mr. Champion in the application for reinstatement that he was in good health was only a representation that he believed he was in good health and had no reasonable ground to think otherwise.

The general rule, then, declared by the Court in Moulor v. American Life Ins. Co., 111 U.S. 335, 4 S.Ct. 466, is that a policy will not be avoided by the untruthfulness of a representation made in good faith if it is possible to construe the policy so as not to make the statement an absolute representation or warranty.

In 29 Am.Jur., Sec. 703, under the heading of "Insurance," the rule as to opinions expressed by an applicant which

are made in good faith, but are otherwise not true, is stated as follows:

"Expression of Opinion or Expectation. — Although false, a representation of the expectation, intention, belief, opinion, or judgment of the insured will not avoid the policy if there is no actual fraud in inducing the acceptance of the risk, or its acceptance at a lower rate of premium, and this is likewise the rule although the statement is material to the risk, if the statement is obviously of the foregoing character, since in such case the insurer is not justified in relying upon such a statement, but is obligated to make further inquiry. There is a clear distinction between such a case and one in which the insured fraudulently and intentionally states to be true, as a matter of expectation or belief, that which he then knows to be actually untrue, or the impossibility of which is shown by the facts within his knowledge, since in such case the intent to deceive the insurer is obvious and amounts to actual fraud. Clearly, where matters of opinion or judgment are called for, answers made in good faith and without intent to deceive will not avoid the policy, although they are untrue."

In answer to the question propounded to Mr. Champion by the insurance company as to whether he was in good health, his answer, "Yes," was properly held by the district court to be an answer which was understood by the insurance company to be an answer only to the best of his knowledge; that the answer was made in good faith; that the evidence supports the conclusion that Mr. Champion did not believe, and had no reason to believe, he had any disease or symptoms of disease; and that such answer was not ground for cancellation of the policy.

Moreover, it is to be said that in order to constitute a basis for avoiding an insurance policy on the ground of misrepresentation, the misrepresentation must have been relied upon by the insurer. Zogg v. Bankers' Life Co. of Des Moines, Iowa, 62 F.2d 575 (C.A. 4). If it is obvious that the insurer relied exclusively on its own independent investigation and that the insured's misrepresentations constituted not even a contributory influence, they cannot be seized upon by the insurer to avoid the policy. See Whinfield v. Massachusetts Bonding & Ins. Co., 162 Wis. 1, 154 N.W. 632.

As to reliance of the insurance company in the instant case upon the representation of the insured as to his health, it appears the evidence discloses that when the representative of the "Reinstatement Section" of the insurance company received the completed application for reinstatement of the policy from Mr. Champion, he informed Mr. Champion that he could not give him a decision as to whether the policy would be reinstated; that the underwriters had requested additional information from Dr. Taylor, and that "Just as soon as we hear from him, we will notify you of our decision." Obviously, this decision, whether or not to reinstate, rested on Dr. Taylor's report, dated August 25, 1960, in which Dr. Taylor informed the insurance company with regard to the data requested from him, including laboratory findings —"Negative urine, complete blood count, chest x-ray, Kahn," and "No organic pathology." This report was received by the insurance company on August 29, 1960, and the policy was reinstated on August 30, 1960. Under these circumstances, it seems beyond question that the insurace company relied upon Dr. Taylor's medical report, including the above-mentioned tests and on the fact that there was no organic pathology to report, rather than on Mr. Champion's statement that he was in good health. We need not rest decision on the insurance company's reliance upon Dr. Taylor's medical report rather than upon Mr. Champion's innocent reply in the insurance company's reinstatement form that he was in good health, but the case, on this aspect, could be determined on this issue.

In several Michigan cases there is language stating that an insurance contract

may be rescinded for an untrue statement made in good faith, or in ignorance of its falsity, if the representation materially affected assumption of the risk by the insurer. This rule, if actually applied to bona fide statements made as to "good health," would result in such statements being warranties rather than representations as to belief. Such a rule, if applied, would seem to be a hang-over from a time when such statements were construed, in favor of an insurer, as warranties by the insured. Thus, in Hann v. National Union, 97 Mich. 513, 56 N.W. 834, the court speaks of a breach of warranty based on a statement of good health made by the insured. However, in the Hann case, the representation of good health was made "to the best of my knowledge and belief." The court held that because of this latter statement, it was immaterial whether the insured knew of the existence of any disease. In its decision, the court referred to a Vermont case, stating:

"In Powers v. [North Eastern Mut.] Life Association, 50 Vt. 630, the jury found specially that the assured had disease of the heart at the time the application was made, but that he did not know it, and might not reasonably have been expected to know it. In the application, which was made a part of the policy, he was asked the question whether he then had or had had disease of the heart, and answered, 'No.' The application contained the same stipulation as the one in suit here,—that it should form the basis of the contract, *and be a warranty,* and if any statement should be found untrue, the policy should be void. It was said by the court: 'If he had answered that he had no knowledge that the disease existed, the finding of the jury might affect the result.' (Emphasis supplied.)

"So in the present case, if the statement had been made without this qualification, the defendant undoubtedly would have been entitled to the charge that 'it is wholly im-

material whether the applicant knew of the existence of the disease or not.' If Hann's statement may be considered as amounting to a warranty at all, it is nothing more than a warranty that, so far as his information and knowledge extended, he was in good health. Under such warranty or mere representation, whichever it may be called, in order to defeat recovery upon the policy, it would be necessary to show that the applicant knew or had reason to believe that he was not in good health at the time the application was made." (p. 518, 56 N.W. p. 836)

But Moulor v. American Life Ins. Co., 111 U.S. 335, 4 S.Ct. 466, excluded any construction of an insurance contract to the effect that a bona fide statement of good health made by the insured if afterward found contrary to the actual fact, vitiated the policy; or, that such a statement was, in effect, a warranty; and modern statutory enactments, see M.S.A. 24.12218, emphasize the fact that such a statement of good health, in order to justify a rescission, must be material. The word "warranty" is not even mentioned in the Michigan insurance statutes here relied upon by both parties. Warranties are banished, by statute, from all statements made by the insured. M.S.A. 24.14016. There is no warranty in this case, but only a representation. If such statements, or representations, as to good health are made in good faith, they are to be understood by the insurer to be only bona fide representations that the applicant is in good health according to the best of his belief and without any reasonable cause on his part to believe that he is not in good health. In such a case, this kind of statement, or representation, is to be deemed not material to the assumption of the risk.

In all cases cited by appellant to the effect that the language therein lends support to the view that an insurance contract may be rescinded for an untrue statement made in good faith or even in ignorance of its falsity if the representation materially affected assumption of the

risk by the insurer, it appears that in each case, however, the Supreme Court of Michigan carefully reviewed the facts of which the insured had knowledge, and in each case it appeared that the insured did have knowledge of conditions of his health that, in good faith, he was bound to have disclosed to the insurer.

Thus, in National Life & Accident Ins. Co. v. Nagel, 260 Mich. 635, 245 N.W. 540, where it was held that although the insured was ignorant of his true condition and made the representation in question without actual intent to deceive when he was asked whether he was in good health, and answered that he was, "but 'was just getting over the flu,'" it appeared that the insured had been under a doctor's care. When he stated that he was in good health, except that he was just getting over the flu, he did know that he had had a succession of attacks of influenza, high fever, night sweats, and pain in his side, together with annoying expectoration, and that the doctor was in frequent attendance upon him for these maladies.

In Prudential Ins. Co. v. Ashe, 266 Mich. 667, 254 N.W. 243, the insured, in an application for reinstatement, stated that he was in good health and had no illness or medical treatment *since the date of issue of the policy in 1928.* It appeared that, in 1930, he was operated upon for appendicitis and, about that time, an X-ray disclosed an early parenchymal type of tuberculosis in the upper right lung with lesions fairly well arrested; that in August 1930, he was again treated for pleurisy; that in February 1932, he was treated for inflammation of the lumbar region; and that, on the 15th and 26th of March he was treated for a fistula. All of the foregoing illnesses, treatments, X-rays, and the surgical operation occurred prior to his application for reinstatement which was made on April 13, 1932, and subsequent to the original issuance of the policy in 1928. In its determination of the case, the court said that when the application for reinstatement was made and the insured stated he was in good health so far

as he knew, he actually knew that he had been ill of pleurisy, that he suffered pains, that he had been told that he had some indications of tuberculosis and had just finished treatments for lumbago and was being treated for a fistula. The court held that the foregoing constituted sufficient misrepresentation of facts to avoid the policy.

In Manufacturers Life Ins. Co. v. Beardsley, 365 Mich. 308, 112 N.W.2d 514, the insured's application for insurance represented that he was free from disease or symptoms of disease and in sound health; that he had never consulted or been examined or advised by any doctor; that he had never gone to a hospital, sanitorium, or asylum for any reason; that he had never had any illnesses, diseases, operations, or accidents; and that he did not use beer, wine, spirits, or other intoxicants. It appeared from the evidence that the insured had suffered for many years from severe headaches and that once or twice a year, he blacked out or fainted without apparent cause. It further appeared that in 1947 or 1948, at least seven years before the policy of insurance was issued, his parents consulted a physician who had him hospitalized for examination and observation by other doctors and that, in the Fall of 1956—about the time the policy was issued—the insured again consulted a doctor. Further evidence revealed that the insured did use intoxicants frequently, and, with some degree of regularity, to excess. These false statements, the court held, had a material effect upon the insurer's acceptance of the risk.

In Ranger, Inc. v. Equitable Life Assur. Soc. of U. S., 196 F.2d 968 (C.A. 6), this court had occasion to pass upon a Michigan case in which the insured, in his application for insurance, had stated that he had never been treated for any disease or disturbance of the skin; that he had never been in any hospital for observation, treatment, or an operation; that he had never consulted or been treated by any physician, practitioner, or specialist during the past five years. However, the evidence disclosed that a

little more than three years before the policy was issued, he had consulted a physician about a growth on his face, which had a distinctly black appearance and was changing in its characteristics and becoming larger; that the insured was admitted to a hospital on November 30, 1943, less than six weeks before the issuance of the policy, for the removal of a mole on his face; that a surgical operation was performed upon him and the mole removed; that there was evidence that the tumor, or mole, on the patient's face was growing larger in 1943; that it was a malignant tumor in January 1947, when the policy was issued, and that the insured died of metastatic malignant melanoma on December 2, 1948. The court affirmed the judgment of the district court based on the ground that the false statement of the insured invalidated the policy.

In Michael v. World Insurance Company, 254 F.2d 663 (C.A. 6), after the insured died, and in a suit on the policy, the beneficiary testified that she did not tell the insurance company's agent that the insured had cancer because she "doubted that he would have given the insurance had he known it." The court held that this was a *conscious* withholding of material information from the insurer and that it relied upon the application for reinstatement by reason of it.

In all of the foregoing cases, the insured knew of diseases from which he was suffering and they were ailments which were required to be disclosed to the insurance company before the issuance of the policy. None of these cases support the proposition that a statement made by the insured that he was in good health, when he honestly believed that to be the fact, and had no reason to believe or suspect that he was not in good health, vitiates the policy of insurance when it is later discovered that he had a disease that neither he nor his physician suspected at the time he stated that he was in good health. In all of the Michigan cases, although it is said that the insured made a bona fide statement that he was in good health to the insurer, he, unques-tionably, had knowledge about maladies and illnesses from which he was suffering that would reasonably lead any person, in like circumstances, to believe or suspect that he was not in good health.

In Brayer, et al. v. John Hancock Mut. Life Ins. Co., 179 F.2d 925, (C.A. 2), the court held that where an insured disclosed on an application for a life insurance policy that he had been treated for gastroenteritis, but was unaware that he had pancreatitis and no mention of such disease was made on the application, a verdict should have been directed for the executors of the insured on the question of misrepresentation. Furthermore, it held that the insured is required to disclose only the information which is within his knowledge, and that if he fails to inform the insurer that he had been treated for a certain disorder when he is not even aware that such disorder exists, the insurer is not relieved of liability. In speaking for the court, Judge Charles E. Clark said:

"It is a commonplace of insurance law that 'the insured is required to disclose only information within his knowledge, and if he fails to inform the company that he has been treated for a certain disorder when he is not even aware that such disorder exists, the company is not relieved of liability.' 1 Appleman on Insurance Law and Practice, § 247, 1941. This is an adequate answer to the charge that the insured had misrepresented the facts by mentioning only gastroenteritis when he had been diagnosed as having gastroenteritis and pancreatitis. * * * Had the insured known, it is possible that he should still be excused for not having mentioned the pancreatitis on the application, since it is a frequently occurring incident of gastroenteritis and an applicant for insurance can hardly be expected to list every affected part of the body in mentioning an illness. As it is, we do not reach that question. On the facts as they were presented, the trial judge should have held that there

was no misrepresentation in the insured's omission to mention the pancreatitis." (p. 927)

Appellant contends that when the insured stated in his application for reinstatement that the only doctors who had treated him for the past five years were Dr. Taylor and Dr. Large, this statement was false and enabled the insurer to rescind the policy, since the insured had also consulted Dr. Coyle. However, it was established that the condition for which Mr. Champion consulted Dr. Coyle, and for which he was treated, was an allergic condition, which was not a serious ailment and not significant on the question of insurability; and that Mr. Champion's failure to disclose consultation with Dr. Coyle was not a material misrepresentation constituting ground for rescission. If the attendance of the physician was not for any ailment which tended to weaken or undermine Mr. Champion's health, his nondisclosure of the consultation was not ground for rescission.

In Brown v. Metropolitan Life Ins. Co., 65 Mich. 306, 313, 32 N.W. 610, 612, Mr. Justice Morse, in speaking for the court, said:

"As these questions and answers ought to be construed liberally in favor of the assured, I am of the opinion that a mere calling into a doctor's office for some medicine to relieve a temporary indisposition, not serious in its nature, could not be considered an attendance by a physician, within the meaning of this question, nor would the calling at the home by the doctor for the same purpose be so regarded. The jury should have been instructed that the attendance of the physician must have been an attendance upon the assured for some disease or ailment of importance, and not for an indisposition of a day or so, trivial in its nature, and such as all persons are liable to, who are yet considered to be in sound health generally."

See also to the same effect Bullock v. Mutual Life Ins. Co., 166 Mich. 240, 131 N.W. 574; Wohlfeil v. Bankers Life Co., 296 Mich. 310, 296 N.W. 269; and the same conclusion applies to Mr. Champion's consultation with Dr. Taylor on July 1, 1960, with regard to his headaches. As Judge Kaess said in the district court:

"The failure to disclose the fact that Mr. Champion complained of headaches to Dr. Nelson Taylor on July 1, 1960, was not a material misrepresentation since Mr. Champion did not have reason to believe that the headaches were symptoms of a serious ailment. No organic pathology had been found. The examination had only negative results. To require Mr. Champion to have considered the headaches significant when they were not considered significant by his physician would be to impose upon him the difficult work of the underwriter. The insured is not specially equipped to determine what facts are material to the acceptance of a risk. He may be expected to answer in good faith the questions that are put to him, but not to bring an understanding of medicine beyond that of the medical profession to the problem of materiality. Had plaintiff's underwriters found the recurrence of headaches to be material even though their recurrence was not considered to be serious by physicians, the questions in the forms could have been framed to elicit information desired.

"Had they found visual difficulties to be material even though the insured believed them to be caused by bifocal glasses, the questions could have been framed to elicit the information desired. It would be a simple matter for the insurer to ask specific questions relating to the symptoms that were considered significant and eliminate the difficulties inherent in the broad question— 'Are you now in good health.' This plaintiff did not do although it could hardly expect those applying for reinstatement to have mastered

the significance of specific symptoms in relation to insurability."

Mr. Champion's statement in his application for reinstatement that he was in good health did not constitute a warranty or condition precedent. Such statement was a representation and, since it was made in good faith, did not vitiate the reinstatement of the policy, since it must be construed to mean only that he believed the statement to be true and had no reasonable cause to believe the contrary. The insurance company undoubtedly knew that Mr. Champion could state only his own opinion that he had no disease and that he was conscious of no malady or condition which impaired his health. To hold otherwise would be to construe Mr. Champion's statement as a warranty of the truth, when it was no more than a bona fide representation that he believed the statement to be true. Sommer v. Guardian Life Ins. Co. of America, 281 N.Y. 508, 24 N.E.2d 308. Again, it is to be pointed out that the insurance was reinstated only when the insurance company received the medical report of Dr. Taylor, upon which it, obviously, relied in reinstating the policy.

■ With regard to Mr. Champion's statement to the insurance company that he had seen Dr. Taylor for a routine check-up on July 1, 1960, there is nothing in the evidence to indicate that this was a misrepresentation. He did see Dr. Taylor on that date because of headaches; but no organic basis for the headaches was found, and they were not regarded as of a serious character. It was at this time that Mr. Champion arranged for an appointment for a complete physical examination on September 1, 1960, two months later, and obviously neither Mr. Champion nor Dr. Taylor would have delayed such an examination so long if Mr. Champion's headaches had been severe and disabling. There was no evidence of any misrepresentation on the part of Mr. Champion in describing his call on Dr. Taylor on July 1, 1960, as having been made for a "routine check-up."

There was no basis for rescission on the ground that Mr. Champion had concealed any medical treatment in the application for reinstatement.

■ An examination of the record discloses that the district court did not err in excluding, on the ground of privilege, the records of the hospital in which Mr. Champion was a patient when tests were made, a medical history secured, and the lesion of the brain discovered. Michigan Statutes Annotated, Section 27A.2157. Massachusetts Mutual Ins. Co. v. Trustees, 178 Mich. 193, 144 N.W. 538, 51 L.R.A.,N.S., 22; Lair v. Lair, 355 Mich. 10, 94 N.W.2d 74; Ranger, Inc. v. Equitable Life Assur. Soc. of U. S., 196 F.2d 968 (C.A. 6). The fact that the introduction of the hospital records was sought by plaintiff insurance company to enable an intern to refresh his recollection from such records, which he had written, in order to testify as to what Mr. Champion told him of his medical history and physical condition, in no manner militates against the privilege. Moreover, it appears just as contrary to public policy, in Michigan, to let such an intern testify as to what an ill man tells him upon his entrance into a hospital while suffering from a brain lesion, as it would be to permit the patient's own physician to testify as to what he learned from him while acting in his professional capacity. There was no error in the court's exclusion of hospital records or the testimony of witnesses; and we do not find merit in appellant's claim that it has been deprived of its constitutional rights, in being denied due process of law and equal protection thereunder because of the Michigan statutory provisions relating to the physician-patient privilege.

■ Mr. Champion was afflicted with a fast-growing, or expanding cancer of the brain. It has become common knowledge that cancer often does not manifest itself to the person afflicted in the beginning stages of the disease, or for a considerable times thereafter until it suddenly affects a vital part of the body, calling for immediate treatment, and frequently resulting in death although the best of treatment is given as soon as it is discovered. It appears from the evidence

that a person can have maligant meningioma, from which Mr. Champion died, without suffering headaches, and that he could suffer from headaches as a result of allergic rhinitis, which was the diagnosis given by Dr. Coyle.

What can be inferred from the fact that a man who has a policy of life insurance in the amount of $100,000 allows it to lapse because of failure to make a premium payment of only $283.24 until eight or nine days after the expiration of a grace period? Would a man with a family including his wife and eight children dependent on him, allow a policy of such a large amount on his life to lapse, if, at the time of the lapse, he knew he was suffering from a dangerous disease? What inferences could be drawn from these circumstances?

The facts and the inferences to be drawn therefrom, as well as the credibility of the witnesses, and the weight of the evidence, were for the trial court to determine; and it is our conclusion that the court's findings were supported by the evidence, and that there was no error in the conduct of the trial.

In accordance with the foregoing, the judgment entered upon the comprehensive opinion of Judge Kaess is affirmed.